IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| **PRIYA E. MAMMEN, M.D.,**<br>          **Plaintiff,** | **CIVIL ACTION** |
| v. | |
| **THOMAS JEFFERSON UNIVERSITY,**<br>**SIDNEY KIMMEL MEDICAL COLLEGE,**<br>**JEFFERSON UNIVERSITY PHYSICIANS**<br>**AND THOMAS JEFFERSON**<br>**UNIVERSITY HOSPITALS, INC.,**<br>          **Defendants.** | **NO. 20-127** |

## OPINION

Dr. Priya Mammen, M.D., M.P.H., brings claims against her former employers—Thomas Jefferson University, Sidney Kimmel Medical College, Jefferson University Physicians, and Thomas Jefferson University Hospitals, Inc. (collectively, "Defendants") —for sex discrimination and retaliation, in violation of a city ordinance and state and federal law. Mammen alleges that despite her exemplary record of job performance, she was discriminated against compared to male physicians in her department, Emergency Medicine. Specifically, when she complained on behalf of herself and other female physicians, she was retaliated against by Defendants and ultimately her contract was not renewed. Additionally, she was blocked from other job opportunities in Defendants' organization. Defendants now move to dismiss most of the Complaint—Count I (Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e, *et seq.*), Count II (Family Medical Leave Act of 1993, 29 U.S.C. § 2601, *et seq.*), Count III (Pennsylvania Human Relations Act, 43 Pa. C.S.A. § 951, *et seq.*), and Count IV (Philadelphia Fair Practices Ordinance, Phila. Code, § 9–1101)—pursuant to Federal Rule of Civil Procedure 12(b)(6).

I.      **FACTS**[1]

---

[1] These facts are drawn from the Complaint and, for the purposes of the motion to dismiss, will be taken as true. *See*

Mammen was employed by Jefferson University Physicians as an emergency medicine physician starting in August 2012. Throughout her employment, she received consistently positive remarks on her Annual Departmental Reviews and was appointed to the Department of Emergency Medicine Promotions Committee and the Director's Council. By January 2016, her titles included Emergency Physician, Clinical Assistant Professor, and Director of Public Health Programs in the Department of Emergency Medicine in Sidney Kimmel Medical College at Thomas Jefferson University Hospital. As Emergency Physician, Mammen had clinical duties caring for emergency room patients as well as academic responsibilities. She reported to Theodore Christopher, the Chair of the Department of Emergency Medicine, and Bernard Lopez, the Associate Dean of Diversity and Inclusion and the Executive Vice Chair of the Department of Emergency Medicine.

During her employment, Mammen alleges that she was treated disparately compared to her male peers despite being one of the longest-tenured female physicians within the Department of Emergency Medicine ("Emergency Medicine"). She and other female physicians were assigned undesirable shifts and longer working hours. She was also paid less than her male counterparts, particularly when considering the breadth, scope, and quality of her work, and despite her routine performance of research and grant-writing work, which benefitted Defendants and for which she received no compensation.

During her employment, Mammen noticed an underrepresentation of female employees in Emergency Medicine, particularly in high-ranking or leadership positions. For example, all Vice Chairs in the department were male.

Beginning in in 2016, Mammen spoke out about disparate treatment in Emergency

---

*Kost v. Kozakiewicz*, 1 F.3d 176, 183 (3d Cir. 1993).

Medicine. On or about April 22, she complained in writing to Karen Novielli, Vice Provost and Dean of Faculty Affairs and Professional Development, about sex discrimination. She provided information to Novielli that suggested male physicians were being treated more favorably and wrote, "[W]omen such as myself are being discouraged from academic pursuits and herded toward a purely clinical career as a result of a formula that equates our worth highly to the quantity of patient care." Defendants did not investigate her complaint.

Mammen's discriminatory treatment continued: a promotion was delayed as well as the related increase in compensation. Although she was eventually promoted to Associate Professor, her related salary increase did not come through for months when male physicians in the same situation did not experience salary delays.

Mammen continued to complain to Defendants on the following occasions:

- December 23, 2016: She wrote to Christopher, Lopez, Administrator Timothy Sullivan, and Vice Chair of Clinical Operations Frederick Randolph that "[f]or hard-working women, its [sic] not the rigors of the work or the pay that makes a difference, but the perception of fairness and a good working environment with colleagues you respect and who treat you the same. . . . Enticing women is one thing—keeping women is another."

- May 9, 2017: In a meeting with Christopher and Sullivan, Mammen detailed the impact that Defendants' discriminatory treatment was having on her health. She asked about taking a leave of absence due to her medical complications. Sullivan responded, in part, "I'm so sick of everyone always complaining about how women have it worse." Christopher responded by telling Plaintiff that she was ungrateful and "never" says thank you.

- July 18, 2017: During a presentation by Lopez about female faculty hiring, Mammen stated that Defendants had an underrepresentation of female faculty, female physicians were given undesirable shifts at greater rates than male physicians, and Emergency Medicine was losing female doctors at greater rates than male doctors amid the disparate treatment of female physicians.

To the best of Mammen's knowledge, none of these complaints resulted in any investigation or remedial efforts by Defendants.

3

From December 5, 2017 to January 16, 2018, Mammen took Family Medical Leave Act ("FMLA") leave.  On January 17, her first day back to work, Defendants told Mammen to set up a meeting with Christopher and Lopez.  At the meeting on January 30, Christopher and Lopez told Mammen they would not renew her contract when it ended and she would be terminated effective January 31, 2019.  They said she was being terminated because she was not a "good fit" and would "never be happy."  She understood Christopher and Lopez to be referring to her discrimination complaints in saying she would "never be happy."  No other reason for the termination was given during the meeting.  Subsequently, Novielli told Plaintiff she was being terminated because of her "continual" communications with department leadership in which she "continually" sent the message that she was unhappy.

While she remained employed by Defendants for approximately another year, during that time Mammen again complained of discrimination on March 19, 2018 to Novielli in connection with her termination.  Further, on July 26, 2018, she filed a complaint with the Pennsylvania Human Relations Commission ("PHRC"), cross-filed with the Equal Employment Opportunity Commission;[2] and, on August 31, 2018, she notified Defendants that she had filed the complaint and that it alleged sex discrimination and retaliation.

Defendants' discriminatory and retaliatory conduct continued, including assigning Mammen more overtime hours and undesirable overtime shifts, failing to credit her for time spent working on a federal grant that was awarded as a result of her work; and removing files related to her work in a way that made her vulnerable to allegations that she was not complying with applicable privacy policies.

---

[2] To bring suit in Pennsylvania under Title VII, a claimant must first file a complaint with the EEOC within 300 days of the alleged unlawful employment practice.  *See Mandel v. M & Q Packaging Corp.*, 706 F.3d 157, 165 (3d Cir. 2013).  Applying the 300-day statute of limitations period, Plaintiff is allowed to recover for discriminatory conduct occurring on or after September 29, 2017.

4

Mammen again required medical leave as a result of stress, anxiety, and depression arising from Defendants' conduct.  She applied for and was granted FMLA leave, which she took from November 23, 2018 to January 2, 2019.  During her leave, Defendants pressured her to complete patient charts and criticized her work performance.  They threatened her with a negative job reference if she did not perform work while on leave.  Mammen also learned that she would not be retained as an adjunct faculty member to work on a grant she had designed and obtained for Defendants from the Department of Labor.  This contradicted what she had been told in November by Charles Pollack, former director of the Jefferson Institute of Emerging Health Professions, who said her work on the grant would continue even after she left Emergency Medicine.

After her termination notice and before her termination date, Mammen applied for other positions within Defendants' organization.  In October 2018, she applied to a faculty position in Population Health, for which she was qualified and vetted by Defendant's human resources department, but she learned that her name was not passed along to the hiring manager for final consideration.  In January 2019, she applied for a job as an emergency physician at Aria-Jefferson Health.  She interviewed with Gerald Wydro, the Chair of the Aria-Jefferson Emergency Department, who told her that Christopher "blocked" her from being hired or ever working within Defendants' health system again.

After her termination, Mammen was contacted by the acting Dean and Program Director of Defendants' Population Health Program, who planned to hire her to oversee the Dual Medical Doctor and Master of Public Health ("MD/MPH") program.  Mammen ultimately did not receive the position and was told that the decision not to hire her or create the position came from "higher powers."

Mammen filed a PHRC amended complaint on or about March 1, 2019.  She filed her Complaint in federal court on January 7, 2020, followed by an Amended Complaint on March 11.

## II. **LEGAL STANDARDS**

When evaluating a complaint on a motion to dismiss, factual allegations are scrutinized under Rules 8(a) and 12(b)(6) to determine if the allegations and inferences proposed from those allegations are plausible.  *See Ashcroft v. Iqbal*, 556 U.S. 662, 683 (2009).  "To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'"  *See id.* at 678 (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).

"In light of *Twombly*, 'it is no longer sufficient to allege mere elements of a cause of action; instead a complaint must allege facts suggestive of [the proscribed] conduct.'"  *Great W. Mining & Mineral Co. v. Fox Rothschild LLP*, 615 F.3d 159, 177 (3d Cir. 2010) (quoting *Phillips v. Cty. of Allegheny*, 515 F.3d 224, 233 (3d Cir. 2008)).  "[R]ote recitals of the elements of a cause of action, legal conclusions, and mere conclusory statements" are disregarded.  *James v. City of Wilkes-Barre*, 700 F.3d 675, 679 (3d Cir. 2012).  The relevant question is not whether the claimant "will ultimately prevail . . . but whether [the] complaint [is] sufficient to cross the federal court's threshold."  *Skinner v. Switzer*, 562 U.S. 521, 530 (2011).

## III. **ANALYSIS**

Mammen alleges that she was deprived of her FMLA benefits, that she was subjected to sexual discrimination that created a hostile work environment, and that she was retaliated against for engaging in protected activities.  Defendants argue in response that her FMLA interference and retaliation theories, as well as her hostile work environment, retaliatory termination,

retaliatory failure-to-hire,[3] and gender-based termination theories fail, in whole or in part.

### A. FMLA

The FMLA provides eligible employees with "a total of 12 workweeks of leave during any 12-month period . . . [b]ecause of a serious health condition that makes the employee unable to perform the functions of the position of such employee." 29 U.S.C. § 2612(a)(1)(D). Courts have recognized two types of FMLA claims. An "interference" claim arises where an employer interferes with, restrains or denies the exercise of or the attempt to exercise, any right provided under the FMLA. *Thomas v. St. Mary Med. Ctr.*, 22 F. Supp.3d 459, 472 (E.D. Pa. 2014). A "retaliation" claim arises where an employer discriminates against or retaliates against an employee for exercising or attempting to exercise FMLA rights. *Id*. Mammen alleges both here.

#### i. FMLA Interference

It is "unlawful for any employer to interfere with, restrain, or deny the exercise of or the attempt to exercise, any right provided under" the FMLA. 29 U.S.C. § 2615(a)(1). To state an FMLA interference claim, a plaintiff must allege that: (1) she was an eligible employee under the FMLA; (2) the defendant was an employer subject to the FMLA's requirements; (3) the plaintiff was entitled to FMLA leave; (4) the plaintiff gave notice to the defendant of her intention to take FMLA leave; and, (5) the plaintiff was denied benefits to which she was entitled under the FMLA. *Ross v. Gilhuly*, 755 F.3d 185, 191-92 (3d Cir. 2014). "Put more succinctly, [to] state a claim for interference, an 'employee only needs to show that [s]he was entitled to benefits under the FMLA and that [s]he was denied them.'" *Callison v. City of Phila.*, 430 F.3d 117, 119-20 (3d Cir. 2005). The employee need not show discriminatory intent. *Id.* at 120.

Defendants do not dispute that Plaintiff's allegations are sufficient with respect to the

---

[3] Defendants do not move to dismiss Mammen's claim for disparate pay or for retaliatory failure-to-hire based on Christopher "blocking" Mammen's potential employment at Aria-Jefferson.

7

first four elements. They do argue, however, that Plaintiff's contention that Defendants interfered with her FMLA benefits by insisting she do work while on leave is not a basis for a viable claim.

To the contrary, work requests during FMLA leave can constitute interference. *See Smith-Schrenk v. Genon Energy Servs., LLC,* 2015 WL 150727, at *9 (S.D. Tex. Jan. 12, 2015) ("The general consensus among courts is that reasonable contact limited to inquiries about the location of files or passing along institutional or status knowledge will not interfere with an employee's FMLA rights; however, asking or requiring an employee to perform work while on leave can constitute interference."); *see also Arban v. West Publ'g Corp.,* 345 F.3d 390, 405 (6th Cir. 2003) (asking employee to perform work-related tasks while he was on leave interfered with his FMLA rights). But, as a preliminary matter, "for an interference claim to be viable, the plaintiff must show that FMLA benefits were actually withheld." *Capps v. Mondelez Glob., LLC*, 847 F.3d 144, 156 (3d Cir. 2017); *see, e.g.*, *O'Donnell v. Passport Health Commc'ns, Inc.*, 561 F. App'x 212, 217-18 (3d Cir. 2014) (affirming grant of summary judgment where employer's "de minimis contacts" with employee during FMLA leave, primarily about negotiating her salary upon her request, did not constitute FMLA interference).

What quantum of employer-required work while on FMLA leave will rise to the level of interference with such leave, has yet to be addressed by the Third Circuit.[4] Here, Plaintiff alleges that while she was on FMLA leave, Defendants required her to do work, communicated with her in a negative manner about her ability to mentor students and regarding her performance, and threatened her with a negative reference if she failed to comply with

---

[4] Defendants seize on *Callison* for the proposition that "there is no right in the FMLA to be 'left alone.'" 430 F.3d at 121. But the full context of the quotation is: "Nothing in the FMLA prevents employers from ensuring that employees who are on leave from work do not abuse their leave, particularly those who enter leave while on the employer's Sick Abuse List." *Id.* Here, there is no argument being made as to abuse of FMLA leave.

8

Defendants' requests to work while on leave. Taking the allegations as true and viewing them in the light most favorable to the non-moving party, Mammen's allegations here are sufficient. Thus, Defendants' motion to dismiss shall be denied with respect to her FMLA interference claim.

### ii. FMLA Retaliation

Mammen twice took FMLA leave: from December 5, 2017 through January 16, 2018 and from November 23, 2018 through January 1, 2019. In her Complaint, she alleges that she was asked to schedule her termination meeting immediately upon her return from her first FMLA leave and then subsequently learned within six weeks of her return from her second FMLA leave that Christopher had "blocked" her from working anywhere within Defendants' organization.[5]

It is "unlawful for any employer to discharge or in any other manner discriminate against any individual for opposing any practice made unlawful" by the FMLA. 29 U.S.C. § 2615(a)(2). To plead a claim for FMLA retaliation, the Complaint must contain enough facts to plausibly suggest that the plaintiff: (1) took FMLA leave; (2) suffered an adverse employment action; and, (3) that the adverse action was causally related to her leave. *Hansler v. Lehigh Valley Hosp. Network*, 798 F.3d 149, 158-59 (3d Cir. 2015). In their motion to dismiss, Defendants do not dispute the first two prongs, but they do argue that Mammen has not specified whether the decision-makers on each of the adverse actions taken against her knew that she had taken FMLA leave and, as such, she has insufficiently pled causation.[6]

---

[5] Mammen's opposition brief does not address additional alleged adverse actions raised in her Complaint—that Defendants advised her that she would not be retained as an adjunct faculty member on a grant and that the College of Population Health would not be hiring her for a position which had been discussed with Mammen. The Court therefore does not consider these as bases for her FMLA retaliation claim.

[6] In their reply brief, Defendants additionally argue that for her first FMLA leave (December 5, 2017 through January 16, 2018), Mammen pled that she "took medical leave" rather than FMLA leave and on this basis the FMLA retaliation claim should be dismissed with prejudice. Because Defendants raise this argument for the first time on reply and cite no case law, the Court declines to address this argument.

9

"To demonstrate a causal connection, a plaintiff must generally establish either (1) an unusually suggestive temporal proximity between the protected activity and the allegedly retaliatory action, or (2) a pattern of antagonism, coupled with timing to establish a causal link." *Budhun v. Reading Hosp. & Med. Ctr.*, 765 F.3d 245, 258 (3d Cir. 2014) (internal quotations omitted); *see also Conoshenti v. Pub. Serv. Elec. & Gas Co.*, 364 F.3d 135, 143, 146-47 (3d Cir. 2004).  Regarding the termination meeting, Mammen has pled that on May 9, 2017, she met with Christopher and Sullivan, "provided details about medical complications she was experiencing . . . and asked Defendants about taking a leave of absence"; that Defendants approved her FMLA leave; that she took FMLA leave from December 5, 2017 through January 16, 2018; and that on January 17, her first day back at work, she was asked to set up a meeting with Christopher and Lopez, at which point they told her that she would be terminated.  Taking these allegations as true and viewing them in the light most favorable to the non-moving party, Mammen has alleged an "unusually suggestive temporal proximity" sufficient to demonstrate a causal connection and state a claim for retaliation.  *See Budhun*, 765 F.3d at 258; *see also Lichtenstein v. Univ. of Pittsburgh Med. Ctr.*, 691 F.3d 294, 307 (3d Cir. 2012) (finding termination within seven days of the plaintiff invoking her FMLA leave rights to be "sufficient at the prima facie stage"); *Jalil v. Avdel Corp.*, 873 F.2d 701, 708 (3d Cir. 1989) (finding two days unduly suggestive of causation).

Mammen's second retaliation theory is that Christopher "blocked" her from working within Defendants' organization in retaliation for her second FMLA leave.  She alleges that after she interviewed with Wydro for a new job in February 2019, he told her Christopher had called him to say that any effort to hire Plaintiff would be "blocked."  Wydro understood Christopher to be saying she was "blocked . . . from ever working within Defendants' health system again."

Defendants argue that because Mammen learned of Christopher's statement in February—six weeks after she returned from leave—this is insufficient to plead causation.  The Third Circuit has established that "the mere fact that [an] adverse employment action occurs after [protected conduct] will ordinarily be insufficient to satisfy the plaintiff's burden of demonstrating a causal link between the two events."  *Krouse v. Am. Sterilizer Co.*, 126 F.3d 494, 503 (3d Cir. 1997).  "[W]hen a causal connection relies on temporal proximity alone, courts generally require that the termination occur within a few days of the protected activity."  *Rooks v. Alloy Surfaces Co., Inc.*, 2010 WL 2697304, at *2 (E.D. Pa. July 6, 2010) (citing *Jalil*, 873 F.2d at 708); *see also Williams v. Phila. Hous. Auth. Police Dep't*, 380 F.3d 751, 760 (3d Cir. 2004) (concluding that a gap of over two months, taken alone, is insufficient to be "unduly suggestive" of retaliation), superseded by statute on other grounds as stated in *Robinson v. First State Cmty. Action Agency*, 920 F.3d 182, 187-89 & n.30 (3d Cir. 2019).  Six weeks is not unduly suggestive.

However, "[w]here the time between the protected activity and adverse action is not so close as to be unusually suggestive of a causal connection standing alone, courts may look to the intervening period for demonstrative proof [of causation], such as actual antagonistic conduct or animus against the employee."  *Marra v. Phila. Hous. Auth.*, 497 F.3d 286, 302 (3d Cir. 2007).  Mammen has pled facts suggestive of animus: not only was she turned down from multiple positions in Defendants' organization, but Wydro told her that he understood Christopher to be saying she was "blocked . . . from ever working within Defendants' health system again."  Moreover, the fact that Mammen learned of this statement in February (over a month after her FMLA leave) does not mean Christopher did not make this statement or act on this alleged animus earlier.  In sum, Mammen has sufficiently pled that she was "blocked" from other positions in retaliation for her second FMLA leave.

11

### B. Hostile Work Environment

Title VII of the Civil Rights Act of 1964 makes it unlawful for an employer "to discriminate against any individual with respect to his [or her] compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin." 42 U.S.C. § 2000e–2(a)(1). Mammen alleges that she was subjected to discriminatory treatment on the basis of sex, which created a hostile work environment.

Defendants argue that Mammen has failed to state a hostile work environment claim because she failed to identify such a claim in her PHRC complaints and thus failed to exhaust administrative remedies, and because the Amended Complaint fails to identify behavior "severe or pervasive" enough to satisfy the pleading standard.

"To succeed on a hostile work environment claim, the plaintiff must establish that 1) the employee suffered intentional discrimination because of his/her sex, 2) the discrimination was severe or pervasive, 3) the discrimination detrimentally affected the plaintiff, 4) the discrimination would detrimentally affect a reasonable person in like circumstances, and 5) the existence of respondeat superior liability." *Mandel*, 706 F.3d at 167. As to "severity" and "pervasiveness," these "are alternative possibilities: some harassment may be severe enough to contaminate an environment even if not pervasive; other, less objectionable, conduct will contaminate the workplace only if it is pervasive." *Castleberry v. STI Grp.*, 863 F.3d 259, 264 (3d Cir. 2017). Ultimately, "[w]hether an environment is hostile requires looking at the totality of the circumstances, including: the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." *Id.* (internal quotations omitted). By contrast, "simple teasing, offhand comments, and isolated incidents (unless

extremely serious) will not amount to" a Title VII violation. *Faragher v. City of Boca Raton*, 524 U.S. 775, 788 (1998) (internal quotations and citations omitted). The analysis "must concentrate not on individual incidents, but on the overall scenario." *Caver v. City of Trenton*, 420 F.3d 243, 262-63 (3d Cir. 2005). The same standards apply to claims under the PHRA. *See Atkinson v. LaFayette Coll.*, 460 F.3d 447, 454 n.6 (3d Cir. 2006); *Kelly v. Drexel Univ.*, 94 F.3d 102, 105 (3d Cir. 1996).

Before commencing a Title VII action in federal court, a plaintiff must exhaust administrative remedies by filing a charge with the EEOC and receiving a right to sue letter. *Devine v. St. Luke's Hosp.*, 406 F. App'x 654, 656 (3d Cir. 2011). A claim has been administratively exhausted when the specifics of a charge with the administrative agency "fairly encompass a claim" and would put the agency and the defendant employer "on notice" of that claim. *See Antol v. Perry*, 82 F.3d 1291, 1296 (3d Cir. 1996). The ensuing suit is limited to claims that are within the scope of the initial administrative charge. *Id.* Failure to exhaust administrative remedies is not a jurisdictional defect, but rather, provides a basis for dismissal under Rule 12(b)(6). *Anjelino v. New York Times Co.*, 200 F.3d 73, 87-88 (3d Cir. 2000).

As Mammen herself concedes, her PHRC complaints do not use terms like "hostile," "abusive," or "continuing." She argues that the exhaustion requirement is not a rigid, technical one. *See Ostapowicz v. Johnson Bronze Co.*, 541 F.2d 394, 398-99 (3d Cir. 1976); *Fisher v. Catholic Social Servs.*, 2019 WL 3731688, at *4 (E.D. Pa. Aug. 8, 2019) (citing *Hicks v. ABT Associates, Inc.*, 572 F.2d 960, 963, 966 (3d Cir. 1978)) ("[A] plaintiff's failure to check a box on an EEOC Charge Form does not automatically preclude a Plaintiff from pursuing these claims in a subsequent civil lawsuit."). Furthermore, she argues that the allegations she did plead for her sex discrimination claims are the same ones she is now using to allege hostile work

13

environment in this suit, and this factual overlap should suffice to consider both properly administratively exhausted.

While the exhaustion requirement is not rigid, the Third Circuit has barred claims for failure to exhaust administrative remedies even where the plaintiff argued that some of the underlying facts overlapped with a claim that was properly exhausted.  *See Antol*, 82 F.3d at 1296 (holding that "[t]he specifics of [the plaintiff's] disability discrimination charge do not fairly encompass a claim for gender discrimination"); *Barzanty v. Verizon Pa., Inc.*, 361 F. App'x 411, 414 (3d Cir. 2010) (affirming dismissal based on failure to exhaust the hostile work environment claim where the initial charge "identified only an allegation of gender discrimination," the plaintiff "provided no facts that suggest a hostile work environment," and "she did not check the box indicating her charge was a 'continuing action'"); *Green v. Postmaster Gen.*, 437 F. App'x 174, 178 (3d Cir. 2011) (affirming dismissal of the plaintiff's hostile work environment claim for failure to exhaust as she raised only a failure-to-promote claim to the EEOC "which [did] not encompass her separate claim of hostile work environment").

Mammen's citations to the contrary are inapposite.  In *Anjelino*, the Third Circuit found a hostile work environment claim was within the scope of an EEOC charge because it used terms like "abusive atmosphere," which the Court found to be interchangeable with "hostile work environment."  200 F.3d at 94-95.  Here, Mammen points to no such interchangeable terms.  In *Howze*, the Third Circuit concluded that the plaintiff's "new retaliation claim" was within the scope of her failure-to-promote claim where the district court had improperly denied the plaintiff's request to amend her complaint to add retaliation and where the defendant did not contend that the retaliation claim was "beyond the scope" of the original EEOC charge.  *Howze*

14

*v. Jones & Laughlin Steel Corp.*, 750 F. 2d 1208, 1212 (3d Cir. 1984).  That is not the case here.

All of the PHRC complaint citations Mammen provides—including how she was treated differently, penalized more harshly, and given less-desirable shifts—address how she was allegedly disadvantaged relative to her male peers, not how she experienced "severe or pervasive" harassment or intimidation in the workplace.  Nor does Mammen cite any cases that show sex-based disparate treatment allegations "fairly encompass a claim" for hostile work environment for exhaustion purposes.  Even interpreting Mammen's PHRC complaints liberally, her hostile work environment claim is not within the scope of the underlying charge and, accordingly, on that claim she has failed to exhaust administrative remedies and the claim shall be dismissed.

### C. Retaliatory Termination

The same is not so for her claims that she was unlawfully fired in retaliation for "complaining of discrimination."

Title VII prohibits an employer from discriminating against an employee "because [she] opposed any practice may unlawful by this section . . . or because [she] has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this subchapter."  42 U.S.C. 2000e-3(a).  To state a claim for retaliation, a plaintiff must show that: (1) she engaged in a protected activity; (2) the employer took a materially adverse action against her; and, (3) there was a causal connection between the protected activity and the employer's action.  *See LeBoon v. Lancaster Jewish Cmty. Ctr. Ass'n*, 503 F.3d 217, 231 (3d Cir. 2007).

By her own account in the Amended Complaint, Plaintiff engaged in protected activity—complaining of discrimination—on April 22, 2016; December 23, 2016; May 9, 2017; and

July 18, 2017.  Defendants do not dispute that Plaintiff satisfies the first two elements; they argue that her termination on January 30, 2018—six months after the last date on which she alleges she complained—is too attenuated to adequately plead causation.

As discussed above, *supra* Section III(A)(ii), "[w]here the time between the protected activity and adverse action is not so close as to be unusually suggestive of a causal connection standing alone, courts may look to the intervening period for demonstrative proof [of causation], such as actual antagonistic conduct or animus against the employee." *Marra*, 497 F.3d at 302. Mammen has pled that when firing her, Defendants stated as their reason that she was not "happy" and would "never be happy."  Taking inferences in her favor, the Court understands these to be references to Mammen's history of complaining about discriminatory behavior in the workplace.  Mammen's subsequent meeting with Novielli bolsters her claim, given that Novielli said she was being terminated because of her "continual" communications with department leadership in which she "continually" sent the message that she was unhappy.  At this stage, Defendants' statements are sufficiently suggestive of animus to infer that they retaliated against Mammen for her complaints.  Defendants' motion to dismiss with respect to Mammen's retaliatory termination claim is denied.

### D. Retaliatory Failure-to-Hire

Mammen additionally alleges that in response to her filing her PHRC complaint in August 2018, Defendants retaliated against her in the following circumstances:

- "Blocking" her from working in any hospital in the Jefferson system.

- Not hiring her for a faculty position in the College of Population Health Research in October 2018.

- Not hiring her to oversee the MD-MPH program at the College of Population

Health in January 2019.[7]

Defendants do not dispute that Mammen engaged in a protected activity by complaining or that a failure to hire constitutes a materially adverse action; their argument is again about causation. They contend that for each of the three circumstances, she has failed to plead who made the decision not to hire her or that that decisionmaker took her protected activity (making the complaint) into account in their decision.

It is notable that Defendants do not contest that Mammen has sufficiently pled allegations that Christopher—her boss and the person who terminated her employment contract—"blocked" her potential employment at Aria-Jefferson Health. Specifically, Mammen pled that in February 2019, after her contract ended and she met with Wydro to interview for a new job, he told her that through a conversation with Christopher "he understood that Defendants had blocked [Mammen] from ever working within Defendants' health system again." Taking all inferences in Mammen's favor, Christopher knew about her history of complaints and his broad statement about blocking is sufficient to plausibly suggest that Defendants also blocked Mammen from other positions, including the Population Health and MD-MPH positions. Defendants' motion to dismiss shall be, accordingly, denied with respect to Mammen's retaliatory failure-to-hire claim.

### E. Gender-Based Termination

Finally, Mammen alleges that her "sex was a motivating and/or determinative factor . . . in her termination." Defendants respond that "there are no facts pled upon which to base a plausible claim that her gender motivated the decision to not renew her contract."

The Supreme Court has long recognized that treating women as less competent or affording them fewer opportunities is unlawful. *See Oncale v. Sundowner Offshore Servs. Inc.*,

---

[7] Plaintiff's opposition brief states that she is not pursuing a separate failure-to-hire claim based on Defendants' alleged promise to retain her after her termination to continue working with a grant she helped secure.

523 U.S. 75, 80 (1998) ("The critical issue, Title VII's text indicates, is whether members of one sex are exposed to disadvantageous terms or conditions of employment to which members of the other sex are not exposed.") (quotation marks omitted).  To state a prima facie case of gender discrimination, a plaintiff must plead sufficient facts to show that she "(1) is a member of a protected class; (2) was qualified for the position she held; (3) was fired from that position; and (4) suffered adverse action under circumstances that give rise to an inference of discrimination." *Johnson v. St. Luke's Hosp.*, 307 F. App'x 670, 671-672 (3d Cir. 2009).  A plaintiff may establish an inference of discrimination by "rely[ing] on circumstantial evidence that . . . shows a causal nexus between [her] membership in a protected class and the adverse employment action." *See Greene v. Virgin Islands Water & Power Auth.*, 557 F. App'x 189, 195 (3d Cir. 2014).  Ultimately, the "central focus" of a gender discrimination claim "is always whether the employer is treating some people less favorably than others because of their . . . sex." *Sarullo v. U.S. Postal Serv.*, 352 F.3d 789, 798 (3d Cir. 2003) (internal citations omitted).

      Defendants argue that Mammen's belief that her termination was based on sex is insufficient.  In doing so, they rely on a single legal citation: "A plaintiff's subjective belief that [a protected characteristic] played a role in an employment decision is not, alone, sufficient to establish an inference of discrimination." *Magerr v. City of Phila.*, 2016 WL 1404156, at *9 (E.D. Pa. Apr. 11, 2016) (internal quotations omitted).  This bare-bones argument fails in the face of Mammen's pleadings, which do not rest on an abstract belief that her sex resulted in her termination.  She has pled that she and other female emergency room physicians were subject to a long pattern of discrimination in workplace scheduling, promotion, and the balancing of clinical and academic responsibilities.  She further alleged that despite receiving positive annual reviews and never being told her job was in jeopardy, she was terminated for the vague reason

18

that she was "not a good fit." Viewing these allegations in the light most favorable to Mammen and taking the context provided by reading the Complaint as a whole, the Court will allow her gender-based termination theory to proceed to discovery.

### IV.     <u>CONCLUSION</u>

For the foregoing reasons, Defendants' motion to dismiss shall be granted in part and denied in part. An appropriate order follows.

**May 26, 2020**

                                                **BY THE COURT:**

                                                /s/Wendy Beetlestone, J.

                                                _____
                                                **WENDY BEETLESTONE, J.**