**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| **PRIYA E. MAMMEN, M.D., M.P.H.,**<br>**Plaintiff,** | **CIVIL ACTION** |
| **v.** | |
| **THOMAS JEFFERSON UNIVERSITY,**<br>**JEFFERSON UNIVERSITY**<br>**PHYSICIANS, THOMAS JEFFERSON**<br>**UNIVERSITY HOSPITAL AND SIDNEY**<br>**KIMMEL MEDICAL COLLEGE,**<br>**Defendants.** | **NO.  20-0127** |

## MEMORANDUM OPINION

Plaintiff Priya E. Mammen, M.D., M.P.H., brings this employment action against her former employers, Thomas Jefferson University, Jefferson University Physicians, Thomas Jefferson University Hospital, and Sidney Kimmel Medical College (collectively, "Defendants"). She alleges gender-based discrimination and retaliation pursuant to Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e, *et seq.* ("Title VII"), the Pennsylvania Human Relations Act, 43 Pa. C.S.A. § 951, *et seq.* ("PHRA"), and the Philadelphia Fair Practices Ordinance, Phila. Code, § 9-1101 ("PFPO"), and retaliation and interference pursuant to the Family Medical Leave Act of 1993, 29 U.S.C. § 2601, *et seq.* ("FMLA").  Defendants move for summary judgment on all claims.

## I.    BACKGROUND

Mammen is an emergency room physician who focuses on matters of public health, including the treatment of individuals with HIV and those suffering from opioid addiction.  She started work with Defendants in September 2012 as a Clinical Assistant Professor in the Department of Emergency Medicine (the "Department"), a position which carried both clinical

care and academic responsibilities.  She reported to Theodore Christopher, M.D., the Department

Chair, and Bernard Lopez, M.D., the Department's Executive Vice Chair and the Associate Dean

of Diversity and Community Engagement in the Sidney Kimmel Medical College and Associate

Provost for Diversity and Inclusion for Thomas Jefferson University.

There is no dispute that Mammen performed her job well and is widely regarded as a

skilled clinician and doctor.  She thus experienced various successes during her tenure with

Defendants.  For instance, in February 2015, Mammen was one of fourteen Department faculty

members asked to serve on the Emergency Medicine Operations Steering Committee; shortly

thereafter, she was designated as the Principal Investigator in a grant-funded study on HIV

treatments; in January 2016, Christopher nominated her for the Dean's Award for Excellence in

Education; that same year, she was selected to attend the Jefferson Leadership Academy and was

personally invited to serve on Philadelphia Mayor Kenney's Opioid Task Force; and, in March

2017, she was promoted to the faculty rank of Clinical Associate Professor, the second-highest

clinical rank in the University.

Things were, however, less sunny behind the scenes.  During her employment, Mammen

testified that she experienced gender-related barriers to her success within the Department.  She

observed that women employees, including herself, were routinely assigned "undesirable" shifts

by Defendants and were required to work more overtime hours than their male colleagues.  She

noted a lack of female leadership in the Department, particularly at the Vice Chair level.  She

observed disparities in the way the Department allocated protected time (*i.e.*, non-clinical time)

between men and women.  For instance, although Mammen, in addition to her departmental

responsibilities, engaged in substantial unfunded policy work related to opioid addiction—work

which brought significant attention to the Department and to the University—she was granted

protected time only for a small portion of these activities. By contrast, she concluded that a male colleague receive protected time for his unfunded external leadership work.

She also testified that she was treated differently than the Department's male employees in a variety of other areas. For instance, during fiscal year 2017, the Department miscalculated her total overtime and clinical hours, which resulted in incorrect information being conveyed to Frederick Randolph, M.D., the Department's scheduler, and others concerning her overtime and clinical load. Further, there was a delay in Defendants' efforts to remedy the miscalculation a delay, she discerned, did not happen in addressing any errors in record keeping with respect to male physicians' overtime and clinical hours.

Mammen further expressed her belief that her 2017 promotion to Clinical Associate Professor was delayed due to her gender. She was the first woman in the Department to be promoted to this role, and testified that she met the criteria for promotion a year before she was actually promoted. She attributes part of this delay to Christopher, who failed to timely submit a letter required for her promotion to be effectuated. Because of this delay, her promotion was not made during the normal cycle, which resulted in her associated salary raise also being delayed. She also observed that the attention and consideration Lopez gave to her male colleagues during the promotional process was markedly different than the attention he gave to her and her work.

Mammen voiced her concerns to the Department. She testified that she complained to both Christopher and Lopez in 2014 about gender discrimination in departmental scheduling. In January 2016, she met with Christopher, Lopez, and Tim Sullivan, the Department's Administrator, regarding her overtime hours. Although he disputes the accuracy of the specifics of her assertions, Christopher testified that he understood Mammen to be complaining that women physicians were being treated unequally with regard to overtime. In April 2016, upon

reviewing details concerning a new University compensation plan, Mammen emailed Karen

Novielli, M.D., the Vice Provost of Faculty Affairs and architect of the compensation plan, the

following:  "I feel that women such as myself are being discouraged from academic pursuits and

herded toward a purely clinical career as a result of a formula that equates our worth highly to

the quantity of our patient care."  In December 2016, Mammen sent an email to Christopher,

Lopez, Randolph, and Sullivan concerning a female resident who, Mammen testified, turned

down a position due to gender disparities within the Department.  In her email, Mammen wrote:

"For hardworking women, its [sic] not the rigors of the work or the pay that makes a difference,

but the perception of fairness and a good working environment with colleagues that you respect

and who treat you the same."

Defendants proved responsive to at least some of Mammen's concerns and requests:  It

adjusted her schedule and provided protected time for her work on the Mayor's Opioid Task

Force, despite there being no external funding for this work; in early 2017, Christopher invited

her, along with three other women, to join regularly scheduled meetings regarding Department

leadership initiatives.  These meetings had previously been attended exclusively by Vice Chairs

of the Department, all of whom were men.  In reconsidering the makeup of these meetings,

Christopher noted that "it just looks bad—a bunch of guys, no women at our premier leadership

meeting."

Mammen's complaints to Department leadership continued.  On May 9, 2017, Mammen

met with Christopher and Sullivan to discuss disparities in forced overtime, the Department's

lack of consideration for her academic outputs, and the delay in her promotion.  In response to

these concerns, Christopher told her that she should be more "grateful."  Mammen testified that

Christopher told her she "never say[s] thank you."  He told her that "he's sick of hearing how

4

women have it worse" and "sick of having the woman discussion."  He commented that the only

reason her delayed promotion was an issue was because she earned more money than her

husband.  On May 30, 2017, Mammen had a meeting with Christopher and Novielli, during

which she complained about gender discrimination with respect to overtime, scheduling, and

leadership in the Department, as well as research time allocation.

Things came to a head—for Defendants, at least—a few months later, when Mammen

submitted her self-evaluation and annual performance review for the 2016-17 academic year.

The Department conducted such employee reviews from late summer to early fall every year.

Lopez was responsible for completing Mammen's annual performance reviews and had

successfully done so in the past; the year prior, Lopez had responded to Mammen's self-

evaluation with the following:

> As Priya has been a member of our [department] for some time, we
> expect that she will serve as a senior leader in the department.  Her
> dedication to the [department] along with her experience and
> expertise qualify her as a leader—the department values her
> contributions and will ask for more of those contributions at a higher
> level.

Lopez refused, however, to complete Mammen's performance review for the 2016-17

academic year.  He premised this refusal on his "negative reaction" to the challenges Mammen

outlined as preventing her from achieving her goals.  Under the heading "Elaborate any

challenges or barriers that may have prevented you from achieving your goals or effectively

completing work projects," Mammen wrote, *inter alia*:

> Clinical time
> 1. Forced OT - in FY17 - did more than 240 hrs of forced ot -
> 2. Disproportionate OT pay
>     a) when its forced is at a lower rate, when its voluntary is at a
> higher rate
>     b) rationale always falls back to "not in the budget"
> 3. Impact on academic productivity

5

    a) no effective protected time for years
. . .
4. Impact on self
    a) sleep
    b) weight
    c) family
    d) depression
    e) burn out
5. discussed with Ted christopher, Bernie Lopez, Karen Novielli
    a) verbal assurances of improvement that never came
. . .

Programmatic work
1. Am PI for ~$380k (total more than $900k in 3 years) worth of grants to dept, but am only covered for 0.17FTE of clinical buy down
    a) am the only faculty that manages a team of staff without specific acknowledgement of such
2. Get no academic or programmatic "credit" for unfunded academic work that has garnered regional and national recognition
. . .

Department support for development or mentoring
1. No organized process for Departmental mentoring, career development,
. . .
    b) No departmental support for my personal efforts in seeking out developmental opportunities
. . .

Research infrastructure of the Dept - unequal access
    a) was initially team based - small core that was supportive of each other
. . .
    b) Changed approach to match system at Penn
      (1) only those with funding allowed to use resources
      (2) no specific plan/approach for developing those without research
        (a) in effect, imposed huge barrier to those trying to develop their academic portfolio as [history] of research begets research funding

. . .
Support/Ancillary Services
1. Departmental Admin
    a) No specific admin level support from department for scheduling, fielding general inquiries, general admin assistance
. . .
    b) No clear outputs of indirect funding I have brought into department

6

> (1) no specific resources, no dedicated resources to my efforts
> or development
> . . .

After reading Mammen's self-evaluation, Lopez communicated with others in the Department to determine whether there was data to support the concerns listed by Mammen. He testified that he had a discussion with Novielli about how to proceed during which Novielli raising the option of terminating Mammen's contract. There is some dispute about which Department leader(s) ultimately decided to terminate Mammen and when that decision was finalized, although the parties agree that Lopez, Christopher, Novielli, and Sullivan were each involved. Emails between Christopher and Lopez indicate that the men had reached at least a provisional decision to terminate Mammen's employment by early November 2017. At no point in this process did Lopez raise his concerns with Mammen's self-evaluation with Mammen herself.

In December 2017, Mammen had surgery and took FMLA leave until early January 2018. The Department did not tell her of the plan to terminate her before she took leave. Rather, on her first day back, she received an email from Christopher's secretary requesting a meeting. On or around January 30, 2018, Christopher and Lopez met with Mammen in Christopher's office, terminated her employment, and provided her with a non-renewal letter which stated that her employment with Defendants would end in one year's time, on January 31, 2019. It was the first time Christopher had issued a non-renewal letter in over twenty years of running the Department.

Lopez and Christopher's stated reason for terminating Mammen was that "[she's] not happy, [she's] never going to be happy." They refused to provide her with any further information. In March 2018, Plaintiff met with Novielli to seek more clarity on why her contract

was not renewed.  Novielli similarly refused to get into specific details while confirming that

Mammen was terminated because she was "unhappy."

On August 31, 2018, Mammen informed Novielli, Lopez, and Christopher that she had

filed a complaint of discrimination and retaliation with the Pennsylvania Human Relations

Commission (the "PHRC").

Nearing the end of her employment with Defendants, Mammen again took FMLA leave.

Her leave began on November 23 and ended on December 31, 2018.  On December 21, Sullivan

sent Mammen an email with the subject "Delinquent charts," informing Mammen that she had

not yet completed approximately 200 charts for patients that she treated from June 20 to October

26, 2018.  The email continued:

> Please be advised that, based on the information in its possession at
> this time, the University believes that it will be required to tell any
> future (potential) employer to which it provides reference
> information that you left Jefferson with approximately 5 months of
> incomplete charts and that in doing so, you placed patients at risk
> and ignored multiple administrative reminders/requests in this
> regard.

Sullivan requested that Mammen contact him to resolve the matter.  She e-mailed him on

December 24 outlining her then current medical limitations but, when she returned from FMLA

leave in January 2019, she completed her overdue patient charts.

In early 2019, Mammen contacted Dr. Jerry Wydro, Chairman of the Department of

Emergency Medicine for Jefferson Northeast, to inform him of her contract non-renewal.

Mammen had trained with Wydro during her residency at Temple University Hospital.  After

learning of Mammen's termination, Wydro considered the potential of her working at Jefferson

Northeast.  On February 11, 2019, Wydro emailed Christopher to see whether "there were any

issues that occurred at Jefferson CC that caused Priya not to be renewed."  The two men had a

8

phone conversation, during which Christopher told Wydro that he was not in a position to recommend Mammen for the position.  Following this conversation, Wydro did not hire Mammen for the Jefferson Northeast position.

## II.    LEGAL STANDARD

"[S]ummary judgment is appropriate where there is no genuine issue as to any material fact and the moving party is entitled to a judgment as a matter of law."  *Alabama v. North Carolina*, 560 U.S. 330, 344 (2010) (citations and internal quotations omitted).  In ruling on a summary judgment motion, a court must "view the facts and draw reasonable inferences in the light most favorable to the party opposing the summary judgment."  *Scott v. Harris*, 550 U.S. 372, 378 (2007) (internal quotations and alterations omitted).  "This standard is applied with added vigor in employment discrimination cases, where intent and credibility are crucial issues."  *Stewart v. Rutgers*, 120 F.3d 426, 431 (3d Cir. 1997).  "A genuine issue is present when a reasonable trier of fact, viewing all of the record evidence, could rationally find in favor of the non-moving party in light of his burden of proof."  *Doe v. Abington Friends Sch.*, 480 F.3d 252, 256 (3d Cir. 2007).

Even where the facts of a case are undisputed, summary judgment may not be granted "if there is a disagreement over what inferences can be reasonably drawn from the facts."  *Ideal Dairy Farms, Inc. v. John Labatt, Ltd.*, 90 F.3d 737, 744 (3d Cir. 1996) (quoting *Nathanson v. Med. Coll. of Pa.*, 926 F.2d 1368, 1380 (3d Cir. 1991)).  "Credibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions . . . ."  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986).  At the summary judgment stage, "all that is required [for the non-moving party to survive the motion] is that sufficient evidence supporting the claimed factual dispute be shown to require a jury or judge to

resolve [at trial] the parties' differing versions of the truth." *Oakley v. Orthopeadic Assocs. of Allentown, Ltd.*, 742 F. Supp.2d 601, 604 (E.D. Pa. 2010) (alterations in original) (quoting *Jackson v. Univ. of Pittsburgh*, 826 F.2d 230, 233 (3d Cir. 1987)).

## III.    DISCUSSION

### A.  Title VII, PHRA, and PFPO Claims

Mammen brings claims for retaliatory termination, retaliatory failure-to-hire, and gender-based termination pursuant to Title VII, the PHRA, and the PFPO.  Claims brought under the PHRA and the PFPO are analyzed under the same legal framework as Title VII claims.  *See Ives v. NHS Human Servs., Inc.*, 2016 WL 4039644, at *2 n.1 (E.D. Pa. July 28, 2016)  Thus, although only Title VII is addressed, the following analysis and conclusions apply equally to Mammen's PHRA and PFPO claims.  *See Joseph v. Cont'l Airlines, Inc.*, 126 F. Supp.2d 373, 376 n.3 (E.D. Pa. 2000).

#### i.   *Retaliatory Termination*

Title VII prohibits an employer from retaliating against an employee "because [she] opposed any practice made unlawful by this section . . . or because [she] has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this subchapter."  42 U.S.C. 2000e-3(a).  An employee states a Title VII retaliation claim either by producing direct evidence of retaliatory treatment or by producing circumstantial evidence that would permit a reasonable jury to infer retaliation.  *See Mardell v. Harleysville Life Ins. Co.*, 31 F.3d 1221, 1225-26 n.6 (3d Cir. 1994), *rev'd on other grounds*, 514 U.S. 1034 (1995).

Where, as here, the employee relies on circumstantial evidence, her retaliation claim is analyzed under the burden-shifting framework set forth in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973).  The employee bears the initial burden of stating a prima facie case of

10

retaliation by establishing that: (1) she engaged in a protected activity; (2) the employer took a materially adverse action against her; and, (3) there was a causal connection between the protected activity and the employer's action. *Moore v. City of Philadelphia*, 461 F.3d 331, 340-41 (3d Cir. 2006). If the employee makes out a prima facie case, the burden of production shifts to the employer to offer a legitimate, nonretaliatory reason for the adverse employment action. *Doe v. C.A.R.S. Protection Plus, Inc.*, 527 F.3d 358, 369-70 (3d Cir. 2008). If the employer advances a legitimate reason for its actions, the burden shifts back to the employee to show that the employer's proffered reason was a pretext for unlawful retaliation. *Id.* at 370.

Defendants do not dispute that Mammen's termination constitutes a materially adverse employment action.[1] Rather, they contend that she did not engage in protected activity, has not established a causal connection between her complaints of discrimination and her termination, and has not established that Defendants' proffered reason for the adverse action was pretextual.

### 1.  *Protected Activity*

Mammen contends that her numerous pre-termination conversations with Defendants' employees—during which she expressly complained of gender disparities within the Department—constitute opposition activity protected under Title VII. Defendants disagree, for two reasons.

First, they argue that Mammen's complaints to Department leadership were too vague to constitute protected activity. Under Title VII, protected activity includes not only formal charges of discrimination, but also "informal protests of discriminatory employment practices, including making complaints to management." *Curay-Cramer v. Ursuline Acad. of Wilmington, Del.*, 450

---

[1] In their briefing, Defendants understood a reference in Mammen's Complaint to "her disparate pay" as the adverse employment action at issue here. Mammen focuses instead on her termination as the relevant adverse action, and Defendants do not disagree that her termination was adverse.

F.3d 130, 135 (3d Cir. 2006) (quoting *Barber v. CSX Distrib. Servs.*, 68 F.3d 694, 702 (3d Cir. 1995)).  Nevertheless, "general complaint[s] of unfair treatment" will not suffice.  *Id.*  Rather, to constitute protected activity, it must be "possible to discern from the context of the [employee's] statement that [she] opposes an unlawful employment practice."  *Id.*  The Third Circuit has thus found no protected activity where, for instance, an employee signed a pro-choice advertisement that did not mention her employment, employers, or gender discrimination, *see id.*, and where an employee complained that a position was given to a less-qualified coworker, but never alleged that he was denied the position for discriminatory reasons, *see Barber*, 68 F.3d at 701-02.

Defendants suggest that most of Mammen's complaints, when "carefully considered," do not allege intentional gender discrimination, and thus cannot constitute protected activity.  To the contrary, when the record evidence is read such that all reasonable inferences are drawn in the light most favorable to the Plaintiff the conclusion necessarily follows that Mammen often raised gender issues in her complaints to Department leadership.  Indeed, Defendants have conceded that Mammen specifically complained of gender discrimination with respect to overtime, scheduling, research time allotment, and departmental leadership in her May 30, 2017 meeting with Christopher and Novielli.  Moreover, Mammen testified that she expressly complained of gender discrimination with respect to overtime, her promotion, and departmental consideration for her academic outputs during her May 9, 2017 meeting with Christopher and Sullivan.  *See Curay-Cramer*, 450 F.3d at 135 ("opposition to an illegal employment practice" is sufficiently specific where the employee "identif[ies] the employer and the practice" at issue).

She has also presented evidence from which a reasonable factfinder could infer that the individuals responsible for her termination interpreted her complaints as alleging gender discrimination.  *See Sanchez v. SunGard Availability Servs. LP*, 362 F. App'x 283, 288 (3d Cir.

2010) ("[C]omplaints must be specific enough to notify management of the particular type of discrimination at issue in order to constitute 'protected activity.'").  Novielli, for instance, testified that she understood Mammen to have complained of gender discrimination during the May 30 meeting.  Mammen testified that Christopher, in response to Mammen's May 9 complaints, told her he was "sick of having the woman discussion."  Christopher himself testified that "every, every question [Mammen] framed . . . a lot of the time it was framed as a gender issue," and that he understood Mammen to have accused himself and Lopez of being "either consciously or I guess unconsciously biased."  In short, Defendants' argument that Mammen's complaints were too vague to be understood as alleging gender discrimination with respect to certain departmental practices cannot stand.

Defendants next contend that Mammen's gender-based criticisms do not constitute protected activity because there was no objectively reasonable basis for Mammen to believe that the Department engaged in unlawful discrimination.  As the Third Circuit has explained:

> [A]lthough a plaintiff in a retaliation case need not prove the merits of the underlying discrimination complaint, she must have acted under a good faith, reasonable belief that a violation existed.  This standard requires an objectively reasonable belief that the activity the plaintiff opposed constituted unlawful discrimination under the relevant statute.

*Daniels v. Sch. Dist. of Phila.*, 776 F.3d 181, 193-94 (3d Cir. 2015) (citations and internal quotations omitted).  In other words, the employee's belief about the employer's discriminatory practices "may be mistaken, but employer retaliation is prohibited if the allegations of discrimination have an objectively reasonable basis in fact."  *Fogleman v. Greater Hazleton Health All.*, 122 F. App'x 581, 583 (3d Cir. 2004).  The employee must subjectively believe that her employer was engaged in unlawful discrimination, and that belief must also find some support in the record.  *See id.* at 583-84 ("A plaintiff must not only show that he *subjectively*

(that is, in good faith) believed that his employer was engaged in unlawful employment practices, but also that his belief was *objectively reasonable* in light of the facts and record presented." (quoting *Weeks v. Harding Mfg. Corp.*, 291 F.3d 1307, 1312 (11th Cir. 2002))).  An employee's complaint is unprotected only where "no reasonable person could have believed that the underlying incident complained about constituted unlawful discrimination."  *Wilkerson v. New Media Tech. Charter Sch. Inc.*, 522 F.3d 315, 322 (3d Cir. 2008).

Defendants do not dispute that Mammen subjectively believed her complaints of gender discrimination.  Rather, they argue that it was unreasonable for Mammen to lodge gender-based complaints about her compensation and schedule, given that the former was determined by a gender-neutral formula and the latter by a computer and the Department's scheduler, Randolph, who did not take Mammen's gender into account.  In response, Mammen repeats her subjective belief that Defendants' compensation and scheduling practices were discriminatory, but points to nothing in the record to support this belief or challenge Defendants' evidence regarding the neutrality of their compensation and scheduling practices.  While Mammen is not required to prove the underlying merits of her discrimination complaints to succeed on her retaliation claim, *see Daniels*, 776 F.3d at 194, she is still required to offer some factual basis for her beliefs, *see Fogleman*, 122 F. App'x at 583-84.

That said, Mammen's gender-based complaints concerned more than just her compensation and schedule.  During the May 9 meeting, for instance, Mammen testified that she discussed gender discrimination in relation to the "delay and disorganization involving [her] promotion."  The record indicates that Mammen was the first woman to be promoted to the role of Clinical Associate Professor.  Mammen testified that while she already met the academic criteria for a promotion in 2015, Lopez nevertheless indicated that she would not be eligible for a

promotion for another one to two years.  She testified to her belief that Lopez consciously did not

want her to be promoted due to her gender, and premised that testimony on her observation that

the attention and consideration Lopez gave to male physicians during the promotional process

was markedly different from the attention and consideration he gave to her.  Her promotion was,

moreover, delayed by Christopher's failure to submit a required document on her behalf, and

according to Mammen, Christopher told her the only reason her promotional delay was an issue

was because she made more money than her husband.

Mammen further complained of gender discrimination with respect to departmental

leadership, and the record indicates that all of the Department's Vice Chair positions did in fact

belong to men.  The record also shows that Christopher opened up a departmental leadership

meeting to a handful of women because "it just looks bad—a bunch of guys, no women at our

premier leadership meeting."  Because a reasonable person could conclude that these challenged

practices were discriminatory, Mammen meets the first prong of her prima facie case.

### 2.  *Causal Connection*

With respect to the second prong, Defendants argue that Mammen has not established a

causal link between her protected activity and her termination, as she fails to show that the

individuals responsible for her termination were aware of her protected activity and fails to

present evidence sufficient to support an inference of causation.

As a threshold matter, an employee claiming unlawful retaliation must generally show

that the decisionmakers were aware of her protected activity at the time they made their adverse

employment decision.  *See Daniels*, 776 F.3d at 196-97 ("The plaintiff, however, cannot

establish that there was a causal connection without some evidence that the individuals

responsible for the adverse action knew of the plaintiff's protected conduct at the time they

acted."); *Moore*, 461 F.3d at 351 ("It is not reasonable for a factfinder to infer that an employer's reaction was motivated by an intent to retaliate for conduct of which the employer's decision maker was not aware.").

Although it is unclear when the decision on Mammen's termination was finalized, the record indicates that initial discussions concerning her termination were taking place in early November 2017. The record also contains evidence from which a factfinder could infer that the individuals involved in Mammen's termination—Lopez, Christopher, Novielli, and Sullivan— were aware of her protected conduct prior to these discussions. Novielli expressly testified that she understood Mammen to be complaining of gender discrimination during their May 30, 2017 meeting. Christopher has testified that Mammen regularly complained of gender issues, and that he understood Mammen to have "accused [him] of being biased against her because she was a woman."

While Lopez has denied having any knowledge of Mammen's gender concerns prior to her termination, there is evidence in the record belying this assertion; for instance, Christopher testified that he, at least, understood Mammen to have lodged accusations of bias against Lopez. In a response to a June 2017 communication from Christopher noting "HR/gender issues" associated with Mammen taking a leave of absence, Lopez responded: "Understood. They are her gender issues." Further, prior to her termination, Mammen testified that she discussed with Lopez a study showing that female doctors have lower patient complication rates, and Lopez commented that Mammen "is the only one who would notice that because [she] focus[es] on gender issues." And though Sullivan similarly testified that he was unaware of Mammen's gender concerns, he was privy to the May 9, 2017 meeting where, according to Mammen, she complained of gender discrimination with respect to overtime and her promotion and Christopher

16

told her that "he's sick of hearing how women have it worse."

As to whether Mammen has presented evidence sufficient to support an inference of causation, Defendants contend that Mammen cannot establish a causal link without evidence of temporal proximity or ongoing antagonism.  Generally, an employee demonstrates retaliatory animus by showing either an unusually suggestive temporal proximity between the employee's protected activity and the employer's adverse action, or a pattern of antagonism in the period between the protected activity and the adverse action.  *See Lauren W. ex rel. Jean W. v. DeFlaminis*, 480 F.3d 259, 267 (3d Cir. 2007) ("[A] plaintiff usually must prove either (1) an unusually suggestive temporal proximity between the protected activity and the allegedly retaliatory action, or (2) a pattern of antagonism coupled with timing to establish a causal link.").

Still, "[i]t is important to emphasize that it is causation, not temporal proximity [or evidence of antagonism], that is an element of plaintiff's prima facie case, and temporal proximity [or antagonism] merely provides an evidentiary basis from which an inference can be drawn."  *Farrell v. Planters Lifesavers Co.*, 206 F.3d 271, 281 (3d Cir. 2000) (alterations in original) (quoting *Kachmar v. SunGard Data Sys., Inc.*, 109 F.3d 173, 178 (3d Cir. 1997)).  Indeed, the Third Circuit has warned against taking "too restrictive a view of the type of evidence that can be considered probative of the causal link."  *Id.*  "Rather, it can be evidence gleaned from the record as a whole from which causation can be inferred."  *Id.*; *Carvalho-Grevious v. Del. State Univ.*, 851 F.3d 249, 260 (3d Cir. 2017) ("The element of causation, which necessarily involves an inquiry into the motives of the employer, is highly context-specific." (quoting *Kachmar*, 109 F.3d at 178)).  Thus, an employee is permitted to "rely on 'a broad array of evidence' to demonstrate a causal link between [her] protected activity and the adverse action taken against [her]."  *Mara v. Phila. Housing Auth.*, 497 F.3d 286, 302 (3d Cir.

2007) (quoting *Farrell*, 206 F.3d at 284).

In this case, although the exact date on which Defendants finalized Mammen's termination is unclear, the parties agree that months passed between Mammen's May 2017 complaints of gender discrimination and her termination. This Court has previously found "[s]ix weeks not unduly suggestive" of retaliatory animus. *See Mammen*, 462 F. Supp.3d at 527. Mammen does, however, present evidence indicative of ongoing antagonism between her and Department leadership. For example, Lopez' refusal to complete her 2016-17 performance evaluation, his refusal to reach out to Mammen to assess the legitimacy of her listed challenges set against the testimony that the challenges listed in Mammen's evaluation—relating to, *inter alia*, overtime, compensation, and departmental support—were all topics discussed during Mammen's pre-termination meetings with Department leadership, is suggestive of retaliatory animus.

Further, the record as a whole contains evidence sufficient to support an inference of causation. The only reason Defendants gave Mammen for her termination was that she was "unhappy," and when Mammen requested more information from Novielli, the latter reiterated that Mammen was being terminated because she was "unhappy." Novielli, however, testified that she based her belief that Mammen was "unhappy" on her pre-termination meetings and conversations with Mammen, during which—as Novielli herself has agreed—Mammen complained of gender discrimination within the Department. Christopher has, moreover, testified that Mammen's concerns with the Department "were those of, of many of [his] faculty members, male and women." What distinguished Mammen from other physicians who voiced concerns with the Department, according to Christopher, is that she complained that the Department was treating her differently because she was a woman. What also distinguished

18

Mammen from these other physicians is that Mammen—a woman who had brought to leadership's attention her concerns about how she and other women were treated—was the only physician not to have her contract renewed in Christopher's twenty-plus years of running the Department. *See, e.g.*, *Kacian v. Postmaster Gen. of the U.S.*, 653 F. App'x 125, 129 (3d Cir. 2016) (inference of causation supported where employer "had not recommended the termination of any employee in his approximately six years as a supervisor" and other employees engaged in similar conduct without suffering punitive consequences).

For the reasons set forth above, Mammen meets her burden of stating a prima facie case of retaliatory termination.

### 3.  Pretext

The burden of production now shifts to Defendants to articulate a legitimate nondiscriminatory reason for Mammen's termination.  "This burden is 'relatively light,' and the employer need only 'introduc[e] evidence which, taken as true, would permit the conclusion that there was a nondiscriminatory reason for the unfavorable employment decision.'"  *Tomasso v. Boeing Co.*, 445 F.3d 702, 706 (3d Cir. 2006) (alteration in original) (quoting *Fuentes v. Perskie*, 32 F.3d 759, 773 (3d Cir. 1994)).

Defendants meet their burden.  They assert that Mammen's 2016-17 performance evaluation—which, according to Defendants, "aired a long list of baseless and gender-neutral grievances"—led Department leadership to conclude that Mammen simply could not be satisfied within the University's structures.  They point to Mammen's promotion and the various ways the Department supported Mammen over the years, including by reducing her overtime and clinical commitment for a period of time.  They point to evidence that, despite this departmental support, Mammen told Christopher that she was thinking of leaving the University for another program

19

and told Sullivan and others that Christopher was an "idiot."  There is testimony that after reviewing and investigating the challenges listed by Mammen in her performance evaluation, the decisionmakers came to the conclusion that Mammen's view of the Department was incompatible with the University's gender-neutral structures.  This evidence, if true, would allow a factfinder to conclude that Defendants had a legitimate, nondiscriminatory reason for terminating Mammen's employment.

Once the employer articulates a legitimate reason for its actions, the employee must respond with evidence that the proffered reason is pretextual.  *Id.*  At the summary judgment stage, an employee establishes pretext by showing "some evidence, direct or circumstantial, from which a factfinder would reasonably either: (1)disbelieve the employer's articulated legitimate reasons; or (2) believe that an invidious discriminatory reason was more likely than not a motivating or determinative cause of the employer's action."  *Fuentes v. Borough of Watchung*, 286 F. App'x 781, 784-85 (3d Cir. 2008); *Kautz v. Met-Pro Corp.*, 412 F.3d 463, 467 (3d Cir. 2005) (to show pretext the employee must "present evidence contradicting the core facts put forward by the employer as a legitimate reason for its decision").

"The prima facie case and pretext inquiries often overlap."  *C.A.R.S.*, 527 F.3d at 370. Thus, "evidence supporting the prima facie case is often helpful in the pretext stage, and nothing about the *McDonnell Douglas* formula requires [a court] to ration the evidence between one stage or the other."  *Id.*  The relevant inquiry is whether the employee has presented evidence "sufficient[] to discredit the defendant's proffered reasons."  *Perskie*, 32 F.3d at 764.

Mammen, too, meets her burden.  Although Defendants suggest that the termination decision was premised on the "baseless" challenges listed by Mammen in her performance evaluation, Lopez himself testified that he has never concluded that Mammen lied about any of

the information contained in her evaluation.  While Lopez reached out to Randolph and Sullivan to "investigate" the legitimacy of Mammen's claims, the responses he received—consisting of two emails—address only a handful of Mammen's listed concerns and do not, in any event, indicate that any of her concerns were illegitimate.

Defendants make much of an email between Mammen and a colleague where Mammen, referring primarily to Christopher, wrote:  "FUCK HIM—actually ALL OF THEM.  I so regret that I am still here . . . what was I thinking."  However, they present no evidence that any of the decisionmakers were aware of this email when deciding to terminate Mammen.  Further, Sullivan testified that Mammen was not the only member of the Department to have made disparaging comments about Christopher—but she was the only faculty member to be terminated.

Further, while Lopez has denied having knowledge of Mammen's gender concerns prior to her termination, this testimony in itself could support an inference of retaliatory animus.  The record contains evidence, discussed *supra*, suggesting Lopez was in fact aware of Mammen's gender concerns, and Christopher testified that Mammen had accused both himself and Lopez of gender bias.  Given record evidence that Lopez, in addition to serving as the University's Associate Provost for Diversity and Inclusion, is also a leader in the field of unconscious bias, the credibility of his denial is at issue and could, in and of itself, lend weight to Plaintiff's contention of retaliatory animus.

Viewing the record in the light most favorable to Mammen, and bearing in mind that "[s]ummary judgment is to be used sparingly in employment discrimination cases," *C.A.R.S.*, 527 F.3d at 369, a reasonable factfinder could find "that an invidious discriminatory reason was more likely than not a motivating or determinative cause" of her termination, *Perskie*, 32 F.3d at

764.  Mammen's retaliatory termination claim may proceed to trial.

### ii. Retaliatory Failure to Hire

The same cannot be said for Mammen's retaliatory failure to hire claim.

After Mammen was notified of her termination, and after she notified Defendants of her complaint with the PHRC, she was rejected for a *per diem* position with Jefferson Northeast, another facility within Defendants' organization.[2]  She asserts that she was rejected for this position in retaliation for her complaints of sex discrimination.  Defendants do not dispute, for purposes of this claim, that Mammen engaged in protected activity and suffered an adverse employment action, thereby meeting the first two prongs of her prima facie burden.  They argue instead that she cannot establish a causal link between her protected activity and her failure to obtain the Jefferson Northeast position.[3]

In early 2019, Wydro and Mammen spoke about the *per diem* position at Jefferson Northeast.  Wydro then reached out to Christopher by email to see "if there were any issues that occurred at Jefferson CC that cause Priya to not be renewed – better stated any barriers or issues to Priya being hired / credentialed here at JNE."  The two men had a phone conversation during which Christopher read a prepared statement.  Although neither Wydro nor Christopher could

---

[2] Mammen alleged other retaliatory conduct in her Complaint, namely, that boxes containing patient files were moved from an office she had used after she notified Defendants of her PHRC Complaint and that after her employment ended, she was denied the opportunity to serve as adjunct faculty and was not hired to a Public Health position at Lankenau Medical Center.  In her opposition briefing, however, Mammen makes clear that her retaliatory failure to hire claim is premised only on Defendants' conduct with respect to the Jefferson Northeast position.

[3] In their opening brief, Defendants focus only Christopher's conduct with respect to the Jefferson Northeast position, arguing that Christopher's refusal to provide Wydro with a positive reference for Mammen does not constitute an adverse employment action.  Mammen argues that Defendants improperly contort her retaliatory failure to hire claim into an "adverse reference" claim, and suggests that the Court should deny summary judgment on this claim as a result.  But Mammen herself has previously focused only on Christopher's conduct—namely, his alleged attempt to "block" Mammen from working within Defendants' health system—when articulating her failure to hire claim.  Although Mammen makes no mention of this "blocking" theory in her present briefing, given her past arguments, Defendants can be forgiven for failing to anticipate how Mammen would articulate this claim in responding to Defendants' present Motion.

remember the exact details of the statement at the time of their depositions, Defendants produced

the following:

> We made the decision not to renew Dr. Mammen's faculty
> appointment and employment after making sincere efforts to make
> her happy.   Despite our efforts, she remained dissatisfied.
> Eventually we felt we had no other realistic option but to move on.
> Although there are no formal barriers to her reemployment in terms
> of being eligible for re-hire, I would not be in a position to
> recommend it.

Wydro testified that he requested "more clarity" from Christopher, which prompted the latter to

reread the statement.  According to Wydro, this was the extent of their conversation concerning

Mammen.  He testified that Mammen's "nonrenewal and the lack of clarity from Jefferson about

[sic] the nonrenewal" were the only reasons he did not hire Mammen.

Mammen concedes that Wydro made the decision not to hire her for the Jefferson

Northeast position.  Thus, to establish causation at the prima facie stage, Mammen must show

that Wydro was aware of her protected activity at the time of his decision, *see Daniels*, 776 F.3d

at 196, and present evidence "sufficient to raise the inference that her protected activity was the

likely reason for" Wydro's decision, *Kachmar*, 109 F.3d at 177.  Wydro has testified that he was

unaware that Mammen was unhappy with the way the Department treated female physicians, and

that he did not know of her PHRC Complaint at the time he made the decision not to hire her.

Mammen presents no evidence rebutting this testimony, but appears to suggest (rather obliquely)

that a jury could infer Wydro knew of Mammen's protected activity because he spoke with

Christopher, and Christopher was aware of at least some of Mammen's protected activities.  But

such an inference would be unreasonable in light of the record, which indicates that while

Christopher did fail to recommend Mammen for the Jefferson Northeast position, he did not

inform Wydro of Mammen's complaints of gender discrimination or that she had taken legal

action against the Department.  Without evidence sufficient to show that Wydro had knowledge of Mammen's protected activity when deciding not to hire her for the Jefferson Northeast position, Mammen's failure to hire claim must be dismissed.

### iii. Gender-Based Termination

Finally, Mammen alleges her contract with Defendants was not renewed because of her gender, in violation of Title VII.  To make out a prima facie case of gender discrimination at the summary judgment stage, the employee must present evidence sufficient to show that she: "(1) is a member of a protected class; (2) was qualified for the position she held; (3) was fired from that position; and (4) suffered adverse action under circumstances that give rise to an inference of discrimination." *Johnson v. St. Luke's Hosp.*, 307 F. App'x 670, 671-72 (3d Cir. 2009). Defendants do not dispute that Mammen meets the first three elements of her prima facie burden, but argue (in a footnote) that Mammen does not offer evidence sufficient to support an inference of discrimination and, in any event, cannot establish pretext.

To support an inference of discrimination, employees generally present comparator evidence, or "evidence that [the employer] treated 'similarly situated' individuals not within [the employee's] protected class more favorably than it treated [the employee]." *See Darby v. Temple Univ.*, 216 F. Supp.3d 535, 542 (E.D. Pa. 2016) (quoting *Wilcher v. Postmaster Gen.*, 441 F. App'x 879, 881 (3d Cir. 2011)).  Nevertheless, an inference of discrimination may be supported "in a number of ways."  *Golod v. Bank of Am. Corp.*, 403 F. App'x 699, 702 n.2 (3d Cir. 2010).  In the absence of comparator evidence, the employee may present, *inter alia*, "evidence of similar [gender] discrimination of other employees, or direct evidence of discrimination from statements or actions by her supervisors suggesting [gender] animus."  *See id.*

24

In this case, the record contains evidence sufficient for a jury to infer that Mammen was terminated because of her gender.  Mammen testified that, prior to her termination and in response to her complaints of gender discrimination, Christopher told her that "he's sick of hearing how women have it worse" and "sick of having the woman discussion."  Despite Mammen's undisputedly excellent job performance, Christopher told her that she should be more "grateful" and say "thank you" more often.  Sullivan, in turn, testified that he had never heard Christopher tell a male physician to be more "grateful."  Moreover, in response to Mammen's concerns about her promotion, Christopher told her that her promotional delay was an issue for her only because she earned more money than her husband.

Of course, an employer's gender-based remarks "do not inevitably prove that gender played a part in a particular employment decision."  *Price Waterhouse v. Hopkins*, 490 U.S. 228, 251 (1989).  Rather, to determine the probative value of employer remarks, courts examine the circumstances in which the statements were made, including: "(1) the relationship of the speaker to the employee and within the corporate hierarchy; (2) the temporal proximity of the statement to the adverse employment decision; and (3) the purpose and content of the statement." *Connolly v. Pepsi Bottling Grp., LLC*, 2008 WL 4412090, at *11 (W.D. Pa. Sept. 22, 2008) (citing *Ryder v. Westinghouse Elec. Corp.*, 128 F.3d 128, 133 (3d Cir. 1997)).  Here, the remarks were made by the Department Chair, who also played a key role in Mammen's termination. They were directed specifically at Mammen, during a meeting in which Mammen testified that she raised gender discrimination concerns.  They were made mere months before the termination decision.  The content of the statements, moreover, permits an inference of gender bias.  A jury could infer, for instance, that Christopher believed Mammen less deserving of her position because she was a woman and found her complaints against the Department offensive for that

reason.  While these remarks may (or may not) on their own be sufficient to support an inference

of gender discrimination, they are nevertheless probative of gender bias.  *See Price Waterhouse*,

490 U.S. at 251.

The record contains other evidence from which a jury could infer that Mammen's

termination was motivated by her gender.  Mammen testified to witnessing other women in the

Department experience gender discrimination, including a female resident who, according to

Mammen, declined a position with the Department because she felt the Department treated

women poorly.  She presented evidence that leadership in the Department was predominately

male.  She testified that the complaints of male physicians were treated differently than those of

female physicians, noting that when a male colleague "blasted" Department leadership,

"leadership immediately started changing things."  She testified that women were not in the

"same position."  *See Josey v. John R. Hollingsworth Corp.*, 996 F.2d 632, 641 (3d Cir. 1993)

(courts may "consider as circumstantial evidence the atmosphere in which the company made its

employment decisions").  Viewing the record as a whole, a reasonable factfinder could infer that

Mammen's termination was motivated by discriminatory animus.

A reasonable factfinder could also find pretext.  The record indicates that Mammen was

excellent at her job.  Thus, Lopez testified that the decision to terminate Mammen originated not

in her job performance, but rather in his "negative reaction" to the way Mammen filled out her

annual performance evaluation, namely, her answers to a prompt asking her to list challenges and

barriers preventing her from achieving her goals.  Again, however, Lopez testified that he never

concluded Mammen was lying about any of her listed challenges; he never spoke with Mammen

herself to confirm whether his "negative reaction" to her listed challenges was valid; and his

investigation into her concerns (Defendants' evidence of which, as noted, consists of just two

email exchanges) appears less than thorough.  Based on this, a jury could infer that Mammen was terminated not based on the content of her complaints, but because she had the audacity to complain at all.

Combine this with the evidence indicating that Christopher admonished Mammen for not being "grateful" (a criticism he had not lodged against a male physician) and Mammen's testimony that the Department treated complaints made by male physicians more favorably than those made by female physicians, and a jury could reasonably infer that Mammen was terminated not just because she complained, but because she was a *woman* who complained.  In other words, based on this record, it would be reasonable to infer that Defendants' proffered reason for Mammen's termination was pretext for unlawful discrimination.

For the reasons set forth above, Mammen's gender-based termination claim survives summary judgment.

### B.  FMLA Claims

Mammen also brings claims pursuant to the FMLA.  The FMLA entitles an eligible employee to "a total of 12 workweeks of leave during any 12-month period . . . [b]ecause of a serious health condition that makes the employee unable to perform the functions of the position of such employee."  29 U.S.C. § 2612(a)(1)(D).

When an employee invokes her FMLA rights, the employer "may not 'interfere with, restrain, or deny the exercise of or attempt to exercise' these rights."  *Lichtenstein v. Univ. of Pittsburgh Med. Ctr.*, 691 F.3d 294, 301 (3d Cir. 2012) (quoting 29 U.S.C. § 2615(a)(1)).  Employers are also prohibited from "discharg[ing] or in any other manner discriminat[ing] against any individual for opposing any practice made unlawful" by the statute.  *Id.* (quoting 29 U.S.C. § 2615(a)(2)).  "The former provision is generally, if imperfectly, referred to as

'interference' whereas the latter is often referred to as 'retaliation.'"  *Id.*  Mammen contends that Defendants engaged in both forms of prohibited conduct with respect to her FMLA leave.

### i.   *FMLA Retaliation*

Mammen argues that Defendants discriminated against her in violation of the FMLA by terminating her employment in retaliation for her use of FMLA leave.[4]  This FMLA retaliation claim is analyzed under the same burden-shifting framework governing Mammen's Title VII retaliation claims.  *Budhun v. Reading Hosp. & Med. Ctr.*, 765 F.3d 245, 256 (3d Cir. 2014).  Thus, to succeed, Mammen must first establish a prima facie case of retaliation by showing that: (1) she took FMLA leave; (2) she suffered an adverse employment action; and, (3) the adverse action was causally related to her leave.  *Hansler v. Lehigh Valley Hosp. Network*, 798 F.3d 149, 158-59 (3d Cir. 2015).  Defendants do not dispute that Mammen took FMLA leave, nor do they dispute that her termination constitutes an adverse employment action.  They do, however, dispute whether a causal connection exists between Mammen's termination and the exercise of her FMLA rights.

As discussed above, "[t]he element of causation, which necessarily involves an inquiry into the motives of an employer, is highly context-specific," *Kachmar*, 109 F.3d at 178, and "must be considered with a careful eye to the specific facts and circumstances encountered," *Budhun*, 765 F.3d at 258 (quoting *Farrell*, 206 F.3d at 279 n.5).  To establish a causal link, the employee need only prove that her use of FMLA leave was a "negative factor" in the employer's

---

[4] Mammen previously advanced a second FMLA retaliation theory, arguing that Christopher "blocked" her employment in Defendants' organization in retaliation for her second FMLA leave.  *See Mammen*, 462 F. Supp.3d at 527-28.  In the instant Motion, Defendants contend that Christopher's statement to Wydro regarding Mammen's employment for the *per diem* emergency physician role does not constitute an adverse employment action and, in any event, was not made to retaliate against Mammen for taking FMLA leave.  Mammen does not respond to these arguments.  Because Mammen neither mentions nor defends her second retaliation theory in responding to Defendants' Motion, the Court finds that Mammen has abandoned this theory.  *See, e.g., Carroll v. Lancaster Cty.*, 301 F. Supp.3d 486, 512 (E.D. Pa. 2018) (finding claim abandoned where not addressed in opposition brief and granting summary judgment).

decision-making process.  *Lichtenstein*, 851 F.3d at 301.

In this case, the evidence creates a genuine issue of fact concerning whether Mammen's use of her FMLA leave was a negative factor in Defendants' decision-making.  Mammen took her first FMLA leave from December 5, 2017 through January 16, 2018.  The record indicates that discussions concerning Mammen's termination took place in or around early November 2017.  Defendants have not provided a clear answer as to who ultimately decided to terminate Mammen; nevertheless, the evidence indicates that Christopher played a central role in Mammen's termination and that he was made aware of Mammen's need for medical leave shortly before the termination discussions took place, having been informed of this fact by Randolph via an email dated September 22, 2017.  The record also contains a document drafted by Christopher which, when viewed in the light most favorable to Mammen, appears to be a list of negative factors relevant to Mammen's future employment.[5]  The list begins with the statement "Priya: What do I do for her?" and expressly references, among other things, Mammen's FMLA leave and her "health issues."  From this, a reasonable jury could infer that Christopher bore some animus toward Mammen because of her medical needs and conclude that Mammen's termination was motivated at least in part by her use of FMLA leave.

The parties do not address the latter stages of the burden-shifting analysis.  As discussed, there is evidence in the record sufficient to support a finding that Mammen was terminated for a legitimate, non-retaliatory reason, namely, because Defendants determined that Mammen could not be satisfied with the University's gender-neutral structures.  At the same time, the evidence is also sufficient to establish pretext, given Christopher's role in Mammen's termination and his "What do I do for her?" list, from which a jury could infer that Mammen's FMLA leave factored

---

[5] When asked during his deposition why and when he created this list, Christopher stated that he could not recall.  .

29

negatively in his decision-making process.

Thus, the FMLA retaliation claim may proceed to trial.

### ii.  FMLA Interference

Mammen does not, however, avoid summary judgment on her FMLA interference claim. To establish FMLA interference, an employee must first show that: (1) she was an eligible employee under the FMLA; (2) the defendant was an employer subject to the FMLA's requirements; (3) the employee was entitled to FMLA leave; (4) the employee gave notice to the defendant of her intention to take FMLA leave; and, (5) the employee was denied benefits to which she was entitled under the FMLA.  *Ross v. Gilhuly*, 755 F.3d 185, 191-92 (3d Cir. 2014).

The employee must also establish prejudice stemming from the employer's violation.  As the Supreme Court has observed, the FMLA:

> [p]rovides no relief unless the employee has been prejudiced by the violation:  The employer is liable only for compensation and benefits lost "by reason of the violation," § 2617(a)(1)(A)(i)(I), for other monetary losses sustained "as a direct result of the violation," § 2617(a)(1)(A)(i)(II), and for "appropriate" equitable relief, including employment, reinstatement, and promotion, § 2617(a)(1)(B).

*Ragsdale v. Wolverine World Wide, Inc.*, 535 U.S. 81, 89 (2002).  An employee establishes prejudice by showing that her employer's failure to comply with the statute "rendered [her] unable to exercise [an FMLA] right in a meaningful way, thereby causing injury."  *Conoshenti v. Pub. Serv. Elec. & Gas. Co.*, 364 F.3d 135, 143 (3d Cir. 2004).

Mammen premises her interference claim on emails from Sullivan, received during Mammen's second FMLA leave.  These emails inquired about the status of Mammen's incomplete patient charts, advised Mammen that her failure to complete the charts prior to leaving her position with Defendants could result in negative reference information, and

requested Mammen contact Sullivan to address the issue.  An employer's contacts with an employee during the employee's FMLA leave may constitute actionable interference, if the contacts are more than de minimis and have the effect of materially interfering with the employee's leave.  *Compare, e.g.*, *O'Donnell v. Passport Health Commc'ns, Inc.*, 561 F. App'x 212, 218 (3d Cir. 2014) (finding employer's contact with employee to discuss her future employment and negotiate her salary to be de minimis and thus nonactionable), *with Smith-Schrenk v. Genon Energy Servs., LLC*, 2015 WL 150727, at *10 (S.D. Tex. Jan. 12, 2015) (finding employer contacts actionable where employer continued to assign employee work while on FMLA leave, resulting in employee working 20 to 40 hours during her leave).

As this Court has recognized, the line demarcating de minimis employer contacts from actionable interference is far from clear.  *See Mammen*, 462 F. Supp.3d at 526 (observing that the Third Circuit has yet to determine "[w]hat quantum of employer-required work while on FMLA leave will rise to the level of interference with such leave").  In this case, Defendants suggest that Sullivan's contacts with Mammen did not materially interfere with her FMLA leave, largely because Mammen did not actually complete her patient charts until after she returned from leave. They argue further that Mammen does not and cannot establish prejudice, having no evidence that she suffered harm as a result of Sullivan's emails.

Mammen commits her interference advocacy to a footnote in her opposition brief, and responds to neither of Defendants' arguments.  She offers no case law suggesting that Sullivan's emails are actionable.  She does not articulate what FMLA benefit she was denied as a consequence of Sullivan's conduct, and cites no evidence indicating that Sullivan's emails had a material effect on her ability to exercise an FMLA right.  Nor does she cite evidence suggesting that she was prejudiced by Sullivan's actions.  Indeed, she cites no evidence at all, despite

bearing the burden on all elements of her FMLA interference claim.  With no evidence to the contrary, the Court cannot venture that Sullivan's actions materially interfered with Mammen's FMLA leave or prejudiced Mammen.

Mammen's FMLA interference claim shall, therefore, dismissed.

## IV.    CONCLUSION

For the foregoing reasons, Defendants' motion for summary judgment shall be granted in part and denied in part.  An appropriate order follows.

**March 5, 2021**                                    **BY THE COURT:**


                                               **/s/Wendy Beetlestone, J.**
                                               _____
                                               **WENDY BEETLESTONE, J.**